**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 1:23CR00027-001 (BAH)** |
| | ) | |
| **Antonio Oseguera Cervantes,** | ) | **[REDACTED]** |
| | ) | |
| **Defendant.** | ) | |

# DEFENDANT'S SENTENCING MEMORANDUM

## I.

## OVERVIEW AND RECOMMENDED SENTENCE

Defendant Antonio Oseguera Cervantes, who comes before this Court to be sentenced, is 68 years old and suffers from a combination of health conditions that substantially limit his life expectancy. Chief among these are [redacted], for which comprehensive treatment is required to prevent [redacted]; and other serious ailments. The defendant also has a family history of [redacted] and members of his legal team.

We have reviewed the Presentence Report (hereinafter "PSR") and have no material objection to its factual content. In fact, we believe the United States Probation Officer (USPO) has done a thorough and insightful job of presenting relevant background information about the defendant, including his childhood and personal upbringing, his employment record, his marital and parental history, and his present health circumstances and need for treatment.

Similarly, we have no objection to the advisory guidelines calculated by the UPSO, which coincide with the Plea Agreement. Of course, in the advent of

United States v. Booker, 543 U.S. 220 (2005) and its progeny, the guidelines are now just one among numerous factors for a Court to consider in determining an appropriate sentence.

Mr. Oseguera faces a statutory minimum term of 10 years on Count 1, and a mandatory consecutive term of 5 years on Count 2, for an aggregate mandatory minimum of 15 years. While the advisory guidelines for Level 43, Criminal History Category III are Life, the Government committed itself in the Plea Agreement not to seek a total prison term beyond 360 months (300 months on Count 1, and 60 months on Count 2).

In assessing the sentencing objectives outlined in 18 U.S.C. §3553(a), the Probation Office has recommended an aggregate sentence of 20 years (240 months), consisting of 180 months on Count 1 followed by 60 months on Count 2. The Probation Office believes, and we concur, that a sentence of this length would be "sufficient, but not greater than necessary" to reflect the seriousness of the offense and to promote respect for the law, as well as to protect the public from further crimes of the defendant. (See Sentencing Recommendation section of Revised Presentence Investigation Report, disclosed on October 26, 2026.)

Mr. Oseguera, through counsel, believes that the Probation Officer's analysis is well-reasoned and just. The defendant does not minimize the seriousness of his crimes. He has acknowledged his long-standing involvement in illegal drug sales. He accepts full responsibility for his offense and blames no one except himself.

However, a relevant part of the calculus here is the defendant's severely impaired health and diminished life expectancy. There is almost no possibility he would survive a 30-year term of imprisonment. Whether he would even make it through the 20-year term that has been recommended by U.S. Probation is highly questionable.

Beside this core consideration, there are other factors that, collectively, weigh in favor of the recommended aggregate sentence of 20 years (15 years on Count 1, plus the mandatory 5-year term on Count 2). Among them are:

1) *The Defendant Has Already Served Numerous Years of Imprisonment in Mexico for the Same Activity, Some of Which Will Not Be Credited.*

In addition to the approximately 20 months that he has been in U.S. custody since being brought to this country on February 27, 2025, Mr. Oseguera already served a total of several years imprisonment in Mexico (in two different periods of detention, the first from 2015 through 2016, and the second from late 2022 until his transfer to the U.S. last year) for the same illegal activity to which he has pled guilty in this Indictment, e.g., involvement with organized drug trafficking. However, at least part of this time (the earlier period of incarceration during 2015-16) will not be credited against any sentence imposed by this Court, since it was based on Mexican charges rather than a U.S. extradition warrant.

2) *Lack of Future Dangerousness / Low Propensity to Recidivate*.

If sentenced to the requested term of 20 years, Mr. Oseguera will probably serve about 15 more years. He will be well into his eighties when he is released, and will be deported to Mexico.

Assuming he is still alive, Mr. Oseguera would pose no threat at that time to reinvolve himself in criminal activity. His ongoing [redacted] will continue, and these will preclude any return to illegal dealings. In fact, the majority, if not all, of the criminal acts underlying Mr. Oseguera's guilty plea are more than a decade old -- occurring prior to 2015, when he was first arrested and imprisoned in Mexico.

Under the earliest possible release scenario, a 20-year sentence would still put Mr. Oseguera long past the point at which defendants such as himself are known to "age out" of delinquent activity.

Moreover, in Mr. Oseguera's case, his involvement was largely situational, derived mostly from being the brother of Nemesio ("El Mencho") Oseguera Cervantes who founded the Cartel de Jalisco New Generation (CJNG). As the Court is aware, Mencho was killed in a confrontation with Mexican law enforcement authorities earlier this year, and practically speaking, Antonio Oseguera's connection to the organization died with him. While it is true that [redacted] never personally been close. Realistically, the risk that this defendant would pose a threat to resume organized drug dealing in his eighties is nil.

3) *Collateral Punishment and Conditions of Confinement*.

As noted in the Presentence Report (see ¶¶118-121), the D.C. Circuit Court has ruled that a downward variance may be appropriate if a defendant's status as a deportable alien is likely to cause fortuitous increase in the severity of confinement. United States v. Smith, 27 F.3d 649, 307 (US App. DC 1994). This would certainly seem to apply to Mr. Oseguera, in that due to his immigration detainer (PSR, Page 2) he will be denied any early release component, halfway house, camp placement, or any of the other numerous incentives and positive programming options that are available to BOP inmates who are U.S. citizens.

Moreover, Mr. Oseguera's time in pre-trial confinement at the Alexandria City Jail has been particularly onerous since he has been held under the Special Administrative Measures (SAM's) which keep him isolated at all times in solitary confinement with greatly reduced access to phone or video calls, written correspondence, or in-person visits with family members and loved ones. These circumstances have made the defendant's time in U.S. custody to date exceptionally punitive and [redacted].

Separate from the length of the sentence to be imposed is the issue of an appropriate designation within the Bureau of Prisons. We would respectfully ask the Court to exercise its discretion to recommend designation to a medical facility within the BOP, such as FMC Butner, FMC Rochester, MCFP Springfield, or another appropriate institution where Mr. Oseguera's serious health needs can be adequately addressed and cared for.

## II.

## ACCEPTANCE OF RESPONSBILITY

Defendant Antonio Oseguera has written a letter to the Court (Exhibit A) in which he states in part:

> I write to you with great respect and humility. I am deeply sorry for my actions and for the harm they caused. I know that I made serious mistakes, and I accept responsibility for them. I want to apologize to the Court, to society, and to everyone who has been affected by my conduct….
>
> I will soon be seventy years old, and I suffer from several chronic medical conditions. One of my greatest fears is that I will die far away from my family. I love my children and my family very much, and I hope that I may one day have the opportunity to spend the remaining years of my life with them.

From the onset of these proceedings, Mr. Oseguera instructed undersigned counsel that he had no interest in going to trial or litigating the charges, and that he wanted to plead guilty. Despite the complexity of this prosecution, spanning as it does more than two decades, multiple countries, and many potential witnesses, the defendant did everything in his power to resolve the case expeditiously and without delay, thus conserving law enforcement and court resources. By the time

of the scheduled court hearing on November 13, just over twenty months will have elapsed from the defendant's arrival in the United States to his sentencing. He filed no pre-trial motions, readily accepted the Factual Basis and Plea Agreement proposed by the Government, and has sought to be cooperative and accommodating throughout this process to the best of his ability. Due to the sensitivity of this prosecution and everything related to it, Mr. Oseguera's decision to handle the case in this way has spared the judicial system substantial cost and disruptions, and has also helped protect the safety of the potential witnesses who will not need to be disclosed or called to testify.

In sum, both in his words and by his actions, Mr. Oseguera has unequivocally accepted responsibility in the fullest sense of the term.

It is a time-honored tenet of the Federal criminal justice system that defendants who plead guilty, express remorse, and shoulder responsibility as Mr. Oseguera has done, should receive some benefit to which a defendant who puts the government to its burden, denies guilt, and goes to trial is not entitled. Unfortunately, given Mr. Oseguera's age and precarious health, a sentence of 30 years would in all likelihood lead to the same end result for him personally as if he had gone to trial: dying in prison without ever being able to return to his family or children. While there is certainly a strong risk that the same could occur with the 20-year sentence recommended by U.S. Probation, it will at least leave the defendant with a modicum of hope as he serves his punishment.

## III.

## DEFENDANT'S POOR MEDICAL CONDITION AND LIMITED LIFE EXPECTANCY ARE A MITIGATING CIRCUMSTANCE THAT MILITATES FOR THE REQUESTED SENTENCE OF 20 YEARS

Antonio Oseguera has been diagnosed with the following medical conditions:

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

The most serious of these conditions are the ones that impact [redacted]. According to medical records obtained from Dr. [redacted]

[redacted]:

> [redacted]

[redacted].

[redacted].

Because Mr. Oseguera's conditions are age-related and progressive, his deterioration can be expected to continue. Generally, it is considered harder for an elderly person to be incarcerated than a younger, physically stronger individual. The inherent punitive elements of confinement are magnified by the loss of physical, mental and cognitive capacity that affect an inmate's ability to function and cope within a prison setting.

These difficulties are borne not only by elderly prisoners, but by the correctional system itself. In an amicus brief filed by a group of former Bureau of Prisons (BOP) corrections officials in support of Daniel Rutherford v. United States and Johnnie Markel Carter v. United States, Nos. 24-820, 24-860 that was heard before the U.S. Supreme Court, the strain that an aging inmate population has placed on the BOP and its capacity to deliver adequate medical care was starkly assessed.[1]

---

[1] "As early as 2000, the Government Accountability Office ("GAO") raised alarms that longer sentences and expanded federal criminal prosecutions would

A sentence that might be survivable for a younger, healthier defendant is experienced differently by a 68-year-old man with multiple chronic conditions and weakened physical resilience. This is not to suggest that a defendant with serious medical conditions is entitled to immunity from punishment. But impaired health, and the likelihood a defendant may not live through their prison sentence if it exceeds a certain length, can rightly be a part of the proportionality judgment under 18 U.S.C. §3553(a).

## IV.
## DEFENDANT'S SOCIAL HISTORY

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 562 U.S. 476 (2011), quoting Koon v. United States, 518 U.S. 81, 113 (1996). The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" Id. at 1240, quoting Williams v. People of the State of New York, 337 U.S. 241, 247 (1949). The Supreme Court has "emphasized that [h]ighly relevant -- if not essential -- to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

---

produce a larger, older inmate population, causing the difficulty and cost of caring for federal prisoners to balloon. This forecast proved accurate. Subsequent reports and testimony from GAO, the Office of the Inspector General of the Department of Justice ("OIG"), and BOP's own consultants in 2008, 2015, 2016, 2017, 2024, and 2025 documented systemic problems with the cost and delivery of medical care to the inmate population across federal prisons." [See Brief of Amici Curiae Former Corrections Officials in Support of Petitioners, Pages 5-6, filed on August 14, 2025.]

The following personal history of Antonio Oseguera is presented in the spirit of 18 U.S.C. §3661 which sets forth, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Antonio Oseguera Cervantes was born in 1958 in an isolated rural hamlet near Aguililla, Michoacan, Mexico. He was the third of seven children. As noted in the Presentence Report [redacted].

Antonio's father was a migrant farm laborer who worked in the United States and would return to visit the family every year until, when Antonio was around 10, he stopped coming and also stopped sending money. In order to help his younger siblings, Antonio left school after the sixth grade to work full-time in the fields. Antonio reports, and members of his family confirm, that his family went through a phase of severe poverty after their father left, including times when there was not enough food.

When Antonio was around 16 years old, he came to look for his father and seek employment. He located his father near Los Angeles, moved in with him for a time, and took a job alongside him in a chain link fence factory. After about a year, Antonio heard from some friends that he could make more money working in restaurants in San Francisco, so he moved up there.

For the next twenty years, Antonio worked in Italian restaurants in the North Beach district of San Francisco. He started as a dishwasher, learned kitchen prep and cooking, and later worked as a waiter and bartender.

In addition to his day job, Antonio often juggled a second nighttime position tending bar at nightclubs around the city. During this time, he married, started a family and raised his children. Antonio's first marriage produced two daughters, [redacted], an administrative assistant in a program that works with teen mothers, and [redacted], who is a teaching assistant for special needs children. Both daughters are raising children of their own and reside in the [redacted] (see letter from Antonio's daughter [redacted], attached at Exhibit C).

While working in restaurants and tending bar, Antonio reports that he fell into a pattern of excessive drinking. He also tried cocaine, became addicted and struggled for many years with this dependency.

In Antonio's case, his personal drug abuse contributed to his involvement in illicit drug sales as a means to offset the cost of his habit. Several contacts with the law followed. In November of 1996, some twenty years after he had originally come to the U.S., Antonio was arrested and charged as one of four defendants in a Federal heroin distribution conspiracy. He was sentenced to 63 months in the Bureau of Prisons. Finishing his sentence in 2001, he was deported to Mexico. As a consequence, he lost not only his Lawful Permanent Resident (Green Card) status, but his marriage (his wife divorced him) and the ability to watch his children grow up.

Returning to Mexico, Antonio moved initially to Apatzingan, Michoacan, and then to the neighboring city of Uruapan. He was employed for a while in a warehouse that supplied construction materials to hardware stores, and later worked as an agave trader.

By this time, Antonio's younger brothers Juan and Nemesio (Mencho), who themselves had returned to Michoacan after living in California, were establishing themselves in the Mexican drug trade. Their connections and standing in that

milieu increased when Antonio's brother Mencho became involved in a relationship with Rosalinda Gonzalez Valencia, sister to the individuals known collectively as *Los Cuinis*.

In the years that followed, Antonio was more frequently assigned drug-related tasks by his brother Mencho or Mencho's in-laws, *Los Cuinis*. Even as Antonio's involvement in this activity deepened, he continued to struggle with alcoholism and drug addiction -- to the point that he spent a year from April 2004 to April 2005 in a residential drug rehabilitation program located in Tlajomulco, Jalisco (see PSR, ¶73). While living in Mexico, Antonio was involved in two long-term relationships. The first one produced two children, now ages 22 and 20, and he has two younger children, ages 6 and 2, from the second relationship.

The Probation Officer interviewed Antonio's second oldest daughter, [redacted], who recalled him as a hardworking and caring father when she was growing up (see PSR, ¶62a). For his part, Antonio expressed regret to the Probation Officer over the knowledge that his poor decisions had caused him to be absent for long stretches of his children's lives. He also shared with this Probation Officer his fear about dying away from his loved ones (PSR, ¶62).

In his presentence interview, Antonio discussed his current struggle with [redacted] related to being confined in near-total isolation at the Alexandria Jail for over a year (PSR, ¶72). He added that being unable to regularly communicate with his family through phone or video calls due to the SAM's restrictions has further exacerbated [redacted] by praying, reading the Bible and other books.

Antonio's adult children remain supportive of him, as do other members of his extended family. His nephew [redacted], states in his appended letter to the Court:

> After I lost both my father and my brother in a tragic car accident, I struggled emotionally and questioned my own future. During that difficult period, my uncle became a father figure to me. He encouraged me, guided me, and helped me find hope when I felt lost. His support changed my life, and I will always be grateful for the love, guidance, and stability he provided. His compassion and empathy have had a lasting impact not only on me but on many members of our family.
>
> I respectfully ask that you consider my uncle's age, his declining health, and the positive influence he has had on those around him. His wife, children, and extended family love him dearly and need him. If he is ultimately permitted to return to Mexico, he wishes only to spend the remainder of his life peacefully with his family and loved ones. (Exhibit C.)

## V.

## THE SENTENCING CONSIDERATIONS SET FORTH IN 18 U.S.C. §3553(a)(2) FURTHER SUPPORT THE REQUESTED SENTENCE OF 240 MONTHS

The §3553(a)(2) factors that United States District Court judges are meant to consider in arriving at an appropriate sentence include the need for just punishment, the need for general and individual deterrence, the need for incapacitation (societal protection), and the aim of providing the defendant with necessary educational and vocational opportunities. These factors each will be discussed briefly as they apply to Antonio Oseguera Cervantes.

*<u>The Need for Just Punishment</u>*

Mr. Oseguera has committed a serious offense that he will regret for the rest of his life and for which he must receive adequate punishment. However, the recommended term of 240 months Federal imprisonment represents ample

retribution to promote respect for the Federal narcotics laws, particularly given the defendant's age and poor health. Each day of his sentence, he will wonder whether he will live long enough to someday rejoin his family.

Adding further punitive weight to the scale is that Mr. Oseguera served several years of imprisonment in Mexico for the exact same activity (facilitating the drug conspiracy) for which he is also being sentenced here, yet part of the Mexican confinement will not be recognized or credited by the BOP.

Finally, Mr. Oseguera's conditions of confinement during the past year have been far more punitive than is normal for a Federal detainee because he has been held in complete isolation from other inmates. The scarring psychological and emotional effects of prolonged solitary confinement are well-documented. Research has found that solitary confinement lasting for longer than 10 days can lead to a variety of negative psychological effects, including chronic depression and suicidal thoughts and behavior.[2] In addition, 50% of U.S. inmate suicides happen among the 2% to 8% of prisoners who are in solitary segregation.[3] Here, the defendant is undergoing this form of enhanced confinement not because of any sort of misconduct on his part while in custody, but due solely to the SAM requirements.

The atypically harsh conditions described above are likely to continue in one form or another for Mr. Oseguera. As noted earlier, he will not qualify for many of the recreational, educational or ameliorative activities that exist for other inmates in the BOP, nor will he be able to earn early release credits through programs such as the First Step Act. Cumulatively, these circumstances add an onerous quality to

[2] Craig Haney. "Mental Health Issues in Long-Term Solitary and 'Supermax" Confinement." *Crime & Delinquency, Vol. 49 No. 1*, p. 132 (2003).

[3] *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It*. San Francisco: Jossey-Bass (1999). Terry A. Kupers, M.D.

the incarceration that Mr. Oseguera will serve, and largely obviate the need for a lengthier prison term beyond 240 months for the purpose of retribution, or "just desserts."

*The Need for Adequate Deterrence*

The need for deterrence encompasses both individual (specific) and societal (general) deterrence. Mr. Oseguera fully recognizes the grave mistake he made by participating in illegal drug distribution. It has wrecked his life and cost him his freedom, his family and his health. The requested 240-month term of imprisonment is adequate to deter him from again violating the law. He has manifested his desire to lead a law-abiding life and aspires only to return to his family for his final years.

From the standpoint of general deterrence, any individual who might be tempted to participate in a multi-national drug conspiracy would think again upon learning they could be facing not only lengthy Federal imprisonment, but lifetime separation from loved ones and the prospect of growing elderly and ill in a penal institution. No reasonable person could ever conclude that a 240-month prison sentence for someone like Antonio Oseguera represents "getting off lightly."

*The Need for Incapacitation*

A 240-month incarceratory term is more than enough to protect the public from any further misconduct by this defendant, particularly since he is in his late 60's, would be in his 80's when released, and will be deported. Simply put, he will be too old, too weak and too ill to even contemplate resuming such activity.

*The Need for Educational and Vocational Programs*

While in the custody of the BOP, Mr. Oseguera may perhaps have a chance to attempt to further his education or take some classes. However, any potential benefit can certainly be absorbed well within a 240-month period. The flip side is that the mandate to provide Mr. Oseguera with needed medical treatment will

become increasingly burdensome and costly to the BOP as he ages and grows more frail.

*Avoidance of Unwarranted Sentence Disparity*

18 U.S.C. §3553(a)(6) references "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." For an offender such as Antonio Oseguera, a 240-month prison sentence for this offense would in no way represent undue disparity in favor of the defendant.

First, it should be noted again that Mr. Oseguera was incarcerated additional years in Mexican prisons for actions that were part and parcel of the same conspiracy, yet part of this time will not be credited.

Second, it is logical and commonplace for a defendant's advanced age and declining health to be considered as part of the sentencing calculus, largely because, as is the case here, it diminishes the risk of recidivism and alleviates concern over future dangerousness of a defendant.

Third, the Government has in their moving papers dedicated several pages to comparisons with other significant drug defendants sentenced in the District of Columbia. Yet a careful assessment shows that most of those individuals were, in fact, higher placed and far more prone to violence than this defendant. The defendants from *Los Cuinis* cartel who were referenced, Gerardo and Jose Maria Gonzalez-Valencia, were, along with their brother Abigael, architects of a global drug operation that shipped tens of thousands of kilos of cocaine and generated hundreds of millions of dollars in drug profits. Antonio Oseguera, though certainly culpable, was not even remotely on their plane. Due to his debilitating alcoholism and cocaine addiction, which necessitated him to spend a full year in a live-in drug treatment program, Antonio was not deemed as sufficiently reliable or stable to

handle responsibilities above a certain threshold.[4] Additionally, both Gerardo and Jose Maria Gonzalez-Valencia were tied to actual murders and solicitation of murders; there is no similar accusation against Antonio.

Antonio was vastly subordinate to his brother, Mencho, as well as the entire top tier leadership of the Cartel de Jalisco Nueva Generacion (CJNG). The Government itself recognizes this in their discussion of relative culpability *vis-a-vis* Gerardo Gonzalez-Valencia when they state:

> Moreover, although the four-level role enhancement is warranted in this case, it bears noting that unlike [Gerardo] Gonzalez-Valencia, Defendant [Antonio Oseguera] was not a top leader and the facts in this case do not include directed murder.[5]

The memorandum follows up by noting immediately thereafter: "…the Government's recommended 360-month sentence is substantially the same as a life imprisonment sentence…"[6] -- an observation with which we agree, and which, in our view, constitutes compelling grounds for the 240-month variant sentence that has been recommended by the Probation Office. Antonio Oseguera was an infinitely less powerful, less connected, less consequential drug ring leader than either Gerardo or Jose Maria Gonzalez-Valencia. Further, unlike Gerardo Gonzalez-Valencia, Antonio did not consume courtroom time to refute the accusations against him, seek delays, challenge witnesses, or disrupt the process in

---

[4] This is not to dispute that Mr. Oseguera occupied an aggravated role within the meaning of U.S.S.G. §3B1.2(a), as stipulated in the Plea Agreement -- the defense fully concedes that point.

[5] See Government's Sentencing Memorandum, Page 17.

[6] *Id.*

any way. He pled guilty without equivocating, and he is ready to accept his punishment. Yet, in the interest of fairness and parity, he should not be faced with the same *de facto life sentence* as was imposed on Gerardo Gonzalez.

## VI.

## CONCLUSION

Antonio Oseguera recognizes that the hardships he has endured are a consequence of his own wrong decisions. His past illegal actions have resulted in him being separated for many years from his family and loved ones. He understands he bears direct responsibility for all of it, that he brought it on himself, and this knowledge will be an ongoing form of self-punishment.

Since undersigned counsel began representing the defendant shortly after his transfer to the United States, he made very clear his desire to plead guilty, take ownership for his crimes, and spare all parties the burden and trouble of litigating this case.

At his present age and condition, Mr. Oseguera poses no risk to reoffend. He is unwell physically, is frequently in pain, and increasingly he struggles [redacted]. As years pass, he will continue to [redacted].

On the grounds set forth in this memorandum and its attachments, it is respectfully recommended that a term of 240 months imprisonment, as recommended by the U.S. Probation Office, would be "sufficient, but not greater

/ / /

/ / /

/ / /

/ / /

than necessary" to impart retribution, effectuate justice, and satisfy the aims of 18 U.S.C. §3553(a).

Dated: October 30, 2026

Respectfully submitted:

*/s/Frank A. Perez*
FRANK A. PEREZ
State Bar No. 00789541
9110 Scyene Road
Dallas, Texas 75227
Telephone (214) 828-9911
Facsimile (214) 828-2104
Email: fperez@frankperezlaw.com

**ATTORNEY FOR DEFENDANT**